**18 MAG 10663**

ORIGINAL

Approved: _____
JENNIFER L. BEIDEL/SARAH E. PAUL
Assistant United States Attorneys

Before:   THE HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :   **SEALED COMPLAINT**

          - v. -                    :   Violations of
                                        18 U.S.C. §§ 1343, 1349,
TODD KOZEL,                         :   1956(h), and 2

          Defendant.                :   COUNTY OF OFFENSE:
                                        NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          SETH ROSE, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service ("IRS"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

          1.   From at least in or about February 2012 to present, in the Southern District of New York and elsewhere, TODD KOZEL, the defendant, and others known and unknown, willfully and knowingly, did conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

          2.   It was a part and object of the conspiracy that TODD KOZEL, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KOZEL, while subject to court orders from a Florida state court (the "Florida Court")

requiring him to disclose and not to liquidate or transfer his assets, and to transfer certain of his assets to his ex-wife (the "Ex-Wife"), engaged with others in a scheme to defraud his Ex-Wife by concealing certain assets in a foreign trust organized under the laws of the Isle of Jersey (the "Foreign Trust") and by using a portion of his Trust assets to purchase a condominium located in New York, New York (the "Condominium") and concealing his ownership of the same.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

3. From at least in or about February 2012 to present, in the Southern District of New York and elsewhere, TODD KOZEL, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KOZEL, while subject to orders from the Florida Court requiring him to disclose and not to liquidate or transfer his assets, and to transfer certain of his assets to his Ex-Wife, engaged with others in a scheme to defraud his Ex-Wife by concealing certain assets in the Foreign Trust and by using a portion of his Trust assets to purchase the Condominium and concealing his ownership of the same.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
(Conspiracy to Commit Money Laundering)

4. From at least in or about July 2013 up to and including at least in or about September 2015, in the Southern District of New York and elsewhere, TODD KOZEL, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

5. It was a part and object of the conspiracy that TODD KOZEL, the defendant, and others known and unknown, in an

2

offense involving and affecting interstate and foreign commerce, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the wire fraud scheme alleged in Count Two of this Complaint, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Special Agent with the IRS and have been personally involved in the investigation of this matter. I base this affidavit on my training and experience as well as on my conversations with others, including other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

7. Based on my review of publicly available information and IRS records, I know that TODD KOZEL, the defendant, is a United States citizen. From in or about 2004 through in or about 2014, KOZEL was the co-founder and Chief Executive Officer ("CEO") of a foreign petroleum company with operations in the Kurdistan Region of Iraq (the "Oil Company").

8. From my review of publicly available information and IRS records, I have learned that TODD KOZEL, the defendant, earned substantial income between 2010 and 2014. Specifically, I have learned that from in or about 2010 through in or about 2014, KOZEL earned an average of approximately $10 million in income per year. Moreover, KOZEL failed to file any U.S. personal income tax returns for the tax years 2011 through 2014.

9. As set forth in greater detail below, between in or about February 2012 and the present, TODD KOZEL, the defendant, engaged in a fraudulent scheme with others to hide assets from his Ex-Wife during their divorce proceeding in the Florida Court (the "Divorce Proceeding") and in violation of orders entered by the Florida Court in the Divorce Proceeding that required KOZEL fully to disclose and not dissipate his assets and to make certain payments to his Ex-Wife. In furtherance of the scheme to defraud, KOZEL, among other things:

    a. Transferred valuable assets, including approximately 29 million shares of the Oil Company that KOZEL owned, into the foreign Trust that he controlled;

    b. Repeatedly lied under oath during the Divorce Proceeding about his control and ownership of the Foreign Trust and its assets;

    c. Violated a Florida Court order requiring KOZEL to transfer 23 million shares of the Oil Company to his Ex-Wife by a certain date, causing his Ex-Wife to suffer substantial financial harm;

    d. Used approximately $12.75 million of KOZEL's assets from the Foreign Trust to purchase the Condominium in New York, New York, with his current wife (the "Wife"), who is a co-conspirator not named as a defendant herein;

    e. Overpaid for the Condominium by more than $2.55 million using Trust assets and then directed that the overpayment amount be funneled to bank accounts belonging to KOZEL and his Wife in Lithuania;

    f. Fraudulently concealed his ownership interest in the Condominium from his Ex-Wife by (i) creating a New York limited liability company (the "LLC") secretly controlled by the Foreign Trust to pose as the paper "owner" of the Condominium; (ii) entering into a sham lease transaction (the "Sham Lease") to make it appear that KOZEL and his Wife were leasing the Condominium and did not own it; and (iii) entering into a backdated sham sale transaction (the "Sham Sale") to prevent his Ex-Wife from seizing the Condominium after the Florida Court ordered KOZEL to pay her an additional $34 million in or about September 2015 ("the Payment Order");

g. Failed to make any payments to his Ex-Wife under the Payment Order and falsely claimed under oath that he was unable to pay; and

h. As a result of the fraudulent scheme, caused his Ex-Wife to suffer tens of millions of dollars in financial harm.

Formation of the Foreign Trust and Early Stages of the
Divorce Proceeding: February 2009 to November 2012

10. Based on my review of court records from the Florida Court and other records subpoenaed as part of the Divorce Proceeding, I am aware of the following:

a. In or around February 2009, TODD KOZEL, the defendant, formed the Foreign Trust with the assistance of a Swiss lawyer (the "Swiss Lawyer") who was a longtime friend of KOZEL's and who is a co-conspirator not named as a defendant herein. One of the Foreign Trust formation documents falsely indicates that the Foreign Trust is a charitable trust with the following beneficiaries: "International Red Cross, Doctors Without Borders, United Nations Childrens [sic] Fund, World Health Organization, Any other organization which is considered to be charitable under Jersey law."

b. In or around April 2009, KOZEL transferred approximately 20 million shares of the Oil Company into the Foreign Trust.

c. In or around August 2010, KOZEL and his Ex-Wife initiated the Divorce Proceeding in the Florida Court.

d. In or around January 2011, the Florida Court enjoined KOZEL's assets in connection with the Divorce Proceeding (the "Asset Injunction"). Pursuant to the Asset Injunction, KOZEL was prohibited from divesting or dissipating any of his assets.

e. In or around February 2011, after the Ex-Wife presented information to the Florida Court suggesting that KOZEL had a connection to the Foreign Trust, the Florida Court amended the Asset Injunction to enjoin assets that KOZEL had diverted to the Foreign Trust.

f. By in or around June 2011, according to an audit of Trust assets conducted in or around October 2013 in

5

connection with the Divorce Proceeding (the "Audit"), the Foreign Trust held approximately 29 million shares of the Oil Company.

   g. On or about January 12, 2012, the Florida Court ordered KOZEL to transfer 23 million shares of the Oil Company, among other assets, to his Ex-Wife. KOZEL was required to transfer the 23 million shares to his Ex-Wife on or before January 27, 2012.

   h. Although KOZEL provided the 23 million shares to his Ex-Wife, he did so more than one month after the court-ordered deadline to do so. As a result of KOZEL's late delivery of the 23 million shares, the future sale value of the 23 million shares was tens of millions of dollars lower than it could have been because of the fluctuation in stock prices.

   i. In or around November 2012, the Ex-Wife filed a motion in the Florida Court for damages resulting from KOZEL's late delivery of the 23 million shares (the "Motion for Damages"). The Motion for Damages put KOZEL on notice that he could face a substantial additional liability to his Ex-Wife.

### KOZEL's Lies to His Ex-Wife about His Interest in the Trust: February 2012 to January 2014

  11. As set forth in greater detail below, TODD KOZEL, the defendant, made material misrepresentations and omissions of fact to his Ex-Wife and the Florida Court about his control of the Foreign Trust in order to conceal his Trust assets during the Divorce Proceeding in furtherance of the scheme to defraud his Ex-Wife.

  12. Based on my review of emails and other records subpoenaed as part of the Divorce Proceeding, I am aware of the following:

   a. According to the Audit, the Foreign Trust held substantially more than 23 million shares of the Oil Company at the time that the Florida Court ordered TODD KOZEL, the defendant, to transfer 23 million shares to his Ex-Wife. Because KOZEL was continuing to conceal his interest in the Foreign Trust from his Ex-Wife, however, he could not directly transfer the shares from the Foreign Trust to his Ex-Wife. Accordingly, in lieu of a direct transfer, in or about February 2012, the Foreign Trust transferred 5,666,667 shares (the

"Partial Payment") to a company that was organized under the laws of Lebanon (the "Lebanon Company").

    b. On or about February 8, 2012, a friend (the "Friend") of KOZEL, who is a co-conspirator not named as a defendant herein, sent an "urgent request" to the Lebanon Company, stating "I kindly ask you to immediately execute the following transfer from your account: Transfer of [the Partial Payment] to [a bank account] [f]or the benefit of [the Ex-Wife]."

    c. Bank records reflect that the Partial Payment was subsequently transferred from the Lebanon Company to the Ex-Wife in partial satisfaction of KOZEL's Florida Court-ordered obligation to transfer the 23 million shares.

    13. Based on my review of records from the Florida Court and my review of sworn deposition testimony of TODD KOZEL, the defendant, given on or about October 15, 2013 in the Divorce Proceeding, I am aware of the following:

    a. On or about December 5, 2012, the Ex-Wife requested as part of the Divorce Proceeding that KOZEL provide "Any and all records or documents . . . that relate to [KOZEL's] interest . . . in [the Foreign Trust]."

    b. On or about June 12, 2013, KOZEL was ordered by the Florida Court to produce the documents requested by the Ex-Wife concerning KOZEL's interest in the Foreign Trust, or to deny under oath that any such documents existed.

    c. In an email to the company performing the Audit dated on or about October 10, 2013, the Swiss Lawyer, stated, "[The Foreign Trust] has received a number of contributions from an individual, Mr. Todd Francis Kozel . . . . These contributions are all the [Oil Company] shares, which are now the assets of [the Foreign Trust] . . . . Todd Kozel is not a beneficiary of [the Foreign Trust]. But he asked [the Foreign Trust] for help and support in the [Divorce Proceeding]."

    d. On or about October 11, 2013, KOZEL filed a sworn affidavit in the Florida Court in which KOZEL stated that he had no records or documents relating to his interest in the Foreign Trust in his "possession, custody or control."

    e. On or about October 15, 2013, KOZEL falsely testified under oath that he "borrowed" 5.6 million shares of

the Oil Company from the Friend before transferring them to the Ex-Wife even though, as described above, these 5.6 million shares came from the Foreign Trust controlled by KOZEL. KOZEL testified that although these 5.6 million shares were worth approximately $25 million at the time, KOZEL posted no collateral for the loan, had no documentation of the loan, and did not recall the terms of the loan, including whether there was an interest rate.

    f. On or about January 3, 2014, KOZEL, acting through counsel, filed in the Florida Court a response stating, "The Former Husband has no documents pursuant to this request. The Former Husband has no interest in [the Foreign Trust]."

    14. Based on my involvement in this investigation and the documents described above, I believe that, taken together, the ability of TODD KOZEL, the defendant, to direct the Foreign Trust to route the Partial Payment through the Lebanon Company to his Ex-Wife demonstrates that: (i) KOZEL controlled the Foreign Trust; (ii) the Swiss Lawyer's statement to the contrary as set forth in Paragraph 13(c) above was false; (iii) KOZEL lied in sworn testimony when he said he "borrowed" the Partial Payment from the Friend; and (iv) KOZEL again lied in sworn affidavits and documents filed in the Florida Court when he said he had no interest in the Foreign Trust and possessed no documents relating to the Foreign Trust.

<u>The Condominium Purchase and KOZEL's Efforts to Conceal the Same: June 2013 to June 2015</u>

    15. Based on my review of bank records, property records for the Condominium, emails, and other records subpoenaed as part of the Divorce Proceeding, I am aware of the following:

    a. On or about June 13, 2013, while the Ex-Wife's Motion for Damages was pending in the Florida Court, TODD KOZEL, the defendant, and the Wife entered into a "Purchase Agreement Information/Deal Sheet" ("the Deal Sheet") to purchase the Condominium in New York, New York. The Deal Sheet listed "[the Wife] and Todd Kozel" as the purchaser and listed the purchase price of the Condominium as $12.75 million.

    b. On or about June 21, 2013, a U.S. lawyer who KOZEL knew (the "U.S. Lawyer") sent an email regarding the Condominium purchase to a law firm representing the seller of the Condominium. The email stated, in substance and in part,

8

that the Wife had signed the purchase agreement for the Condominium and that KOZEL had initiated a wire transfer to effectuate the purchase.

    c. On or about June 26, 2013, a broker representing KOZEL and his Wife (the "Broker") emailed KOZEL regarding the Condominium purchase.  KOZEL responded, in an email, "[W]e are very committed, we want the apartment very much.  Dealing with foreign banks and trying to do everything by phone has its challenges."

    d. On or about July 3, 2013, an "initial deposit" for the Condominium purchase of approximately $2.55 million was sent via wire transfer from an overseas bank account in the name of the Friend to a bank account in New York, New York, with the notation "Intial [sic] Deposit Financing [the Wife]."

    e. On or about September 11, 2013, the Broker emailed KOZEL and the Wife, stating, "Please get in touch with [the U.S. Lawyer] regarding the name of the entity you want to use for the purchase."

    f. On or about September 27, 2013, the Swiss Lawyer sent an email to the U.S. Lawyer stating, in substance and in part, that the Condominium will be owned by a foreign trust and that KOZEL and the Wife will be "renting" the Condominium from that trust.

    g. On or about October 8, 2013, an "additional deposit" for the Condominium of approximately $1.275 million was sent via wire transfer from an overseas bank account belonging to the Lebanon Company to a bank account in New York, New York.  Property management records indicate that the "additional deposit" was paid by the Wife.

    h. On or about November 13, 2013, the Broker emailed the Wife a punch list for construction work being done on the Condominium.  The punch list referred to the owner of the Condominium as "Mr. and Mrs. Kozel."  The punch list also stated, in substance and in part, that "Mr. and Mrs. Kozel" participated in a walkthrough of the Condominium on or about October 30, 2013.

    i. On or about December 5, 2013, the "balance of purchase price" for the Condominium of approximately $11.475 million was sent via wire transfer from a bank account in New

York, New York to another bank account in New York, New York. Property management records indicate that the "balance of purchase price" was paid by the Wife.

        j.    On or about December 6, 2013, the purchase of the Condominium closed. The nominal buyer of the Condominium, as listed on the closing paperwork, was the LLC.

        k.    On or about December 6, 2013, certain service providers emailed KOZEL regarding an overpayment of funds to purchase the Condominium. In pertinent part, the email stated: "In addition to the $2.55 million that is being rerouted I still have $61,468.67 of unused proceeds. I would greatly appreciate it if you could provide me with an email from both Todd and [the Swiss Lawyer] collectively agreeing on where to send the monies."

        l.    On or about December 15, 2013, in response to the email referenced in the preceding subparagraph, an email from a service provider working with KOZEL stated, "I am finally able to provide you with the appropriate wiring instructions for the return of the $2,500,000," and then provided a bank account in the name of the Wife located at a bank in Lithuania ("Lithuania Account-1").

        m.    On or about December 16, 2013, in further response to the email referenced in subparagraph 15(k) above, an email from a service provider working with KOZEL stated, "Todd Kozel has asked me to send you the wire instructions, which are at the foot of this page in an attachment, for the $61,000 which returning to his account."

        n.    On or about December 16, 2013, an "overpayment back to purchaser" of approximately $2.55 million was repaid via wire transfer, from a bank account in New York, New York to Lithuania Account-1. Property management records note that the "overpayment back to purchaser" was sent back to the Wife.

        o.    On or about December 20, 2013, the Wife transferred approximately $1 million from Lithuania Account-1 to a bank account controlled by KOZEL in Lithuania.

        p.    On or about January 7, 2014, KOZEL deposited a check for approximately $61,468.67 into a bank account in the United States that KOZEL controlled. The check was drawn on a

bank in New York, New York. The memo section of the check read "overage for [the Condominium]."

    q. On or about August 25, 2014, the nominal manager for the LLC (the "Nominal Manager"), who is a co-conspirator not named as a defendant herein, emailed the Wife and the Swiss Lawyer, stating: "We should discuss getting a lease, at fair market rent from you and your husband or a company for this apartment. Please let me now your thoughts on what is the correct amount." The Nominal Manager made this proposal despite the fact that KOZEL and the Wife were the owners of the Condominium and were not leasing it.

    r. On or about September 1, 2014, the Wife entered into the Sham Lease, pursuant to which the Wife purportedly agreed to lease the Condominium from the LLC for $40,000 per month for five years, and thus appeared to be a tenant, rather than an owner, of the Condominium. Signatures for the Nominal Manager and the Wife appear on the Sham Lease, although the signatures are undated and it is not clear from the document when they were affixed.

    s. On or about June 15, 2015, the Nominal Manager emailed the Swiss Lawyer regarding the Condominium and stated, "It should be noted that I have not received any rental payment from the tenant from the inception of the lease. Attached is a copy of the most recent version of the lease and addendum. It has not been signed by the tenant."

    16. Based on my involvement in the investigation, there is no evidence that the Wife, or anyone else, ever made a monthly payment under the Sham Lease or that the Condominium was, in fact, being leased by KOZEL, the Wife, or anyone else. Instead, based upon my review of the documents and communications above, I believe KOZEL and his Wife are the owners of the Condominium.

### KOZEL's Efforts to Evade the Payment Order: September 2015 to Present

    17. Based on my review of records from the Florida Court, I am aware that on or about September 10, 2015, the Florida Court granted the Motion for Damages and entered the Payment Order, which ordered TODD KOZEL, the defendant, to pay his Ex-Wife an additional approximately $34 million because of KOZEL's late delivery of the 23 million shares of the Oil Company in or about February 2012.

18. Based on sworn deposition testimony of TODD KOZEL, the defendant, given on or about November 20, 2015, and of the Nominal Manager given on or about December 21, 2015, in the Divorce Proceeding, I am aware of the following:

a. Testimony by the Nominal Manager demonstrates that the Sham Lease was backdated to make it appear to predate the Payment Order. Specifically, the Nominal Manager testified that, despite the fact that the Sham Lease was dated on or about September 1, 2014, the Wife had not signed the Sham Lease as of October 26, 2015, which is over a year after the Sham Lease was purportedly executed and over a month after the Payment Order was entered by the Florida Court.

b. KOZEL's testimony demonstrates that the Sham Lease was designed to hide his and his Wife's ownership of the Condominium from his Ex-Wife. Specifically, KOZEL falsely testified that his Wife rented the Condominium for approximately $30,000 per month from September 2014 through November 2015. KOZEL further testified that the Foreign Trust owned the LLC, which owned the Condominium, but falsely disclaimed that he had any control over, or interest in, the Foreign Trust or, by extension, the Condominium.

19. Based on my review of emails received via subpoena in the Divorce Proceeding and sworn testimony of the Nominal Manager given on or about December 21, 2015 in the Divorce Proceeding, I am aware of the following:

a. On or about September 10, 2015--just one day before the Payment Order was entered--the Condominium was purportedly sold by the LLC to another company organized under the laws of Belize (the "Sham Purchaser") for approximately $17.5 million. The Sham Sale was accomplished via a purchase agreement (the "Sham Purchase Agreement") that was purportedly dated September 10, 2015.

b. Other emails demonstrate that the Sham Sale documents were backdated to pre-date the Payment Order, thereby making it appear that the Condominium was not an asset of TODD KOZEL, the defendant's, which could be seized by the Ex-Wife pursuant to the Payment Order. For example:

i. On or about September 15, 2015, the Nominal Manager emailed the Swiss Lawyer a blank standard form

12

contract and two promissory notes for the sale of the Condominium;

ii. On or about September 16, 2015, the Nominal Manager emailed the lawyer for the Sham Purchaser (the "Sham Purchaser's Lawyer"), stating "I am delighted that you have agreed to represent [the Sham Purchaser] a corporation formed in Belize which bought 100% of the membership of [the LLC] a New York Limited Liability company on September 10, 2015 for $17,500,000.";

iii. On or about September 22, 2015, the Nominal Manager emailed the Sham Purchaser's Lawyer to obtain a fax number to use to send the Sham Purchase Agreement. When asked why the documents could not be emailed, the Nominal Manager stated, "for an undisclosed reason they want to initiate a fax to you."; and

iv. On or about September 23, 2015, the Sham Purchaser's Lawyer received the Sham Purchase Agreement by fax. Although the Sham Purchase Agreement, on its face, appeared to have been signed on September 10, 2015, the Sham Purchase Agreement in large part tracked the language of the blank standard form documents that had been circulated by the Nominal Manager on or about September 15, 2015 - five days after the purported signing date. Further, the purchase price, as listed in the Sham Purchase Agreement, was to include an approximately $3 million cash payment and a promissory note for the balance.

c. In further support of the fact that the "sale" to the Sham Purchaser was orchestrated by KOZEL to protect the Condominium from the Payment Order, on or about August 9, 2016, an accountant emailed the Swiss Lawyer asking if any portion of the sale price had been paid. The Swiss Lawyer responded, "No, no cash has been received. Only the promissory note."

d. Based on my participation in this investigation and surveillance conducted as part of the investigation, there is no evidence that anyone ever paid any portion of the $17.5 million listed in the Sham Purchase Agreement, or that the Condominium was, in fact, purchased by a third party independent of KOZEL. Further, KOZEL and his Wife have been observed entering and exiting the Condominium repeatedly in or about 2018, and as recently as in or about October 2018.

20. Based on my review of records from the Florida Court and of sworn deposition testimony of TODD KOZEL, the defendant, given on or about April 5, 2016, I am aware of the following:

    a. To date, enforcement efforts by the Ex-Wife have resulted in only approximately $76,000 being collected involuntarily from KOZEL.

    b. KOZEL has made no voluntary payments against his approximately $34 million obligation to his Ex-Wife.

    c. Despite KOZEL's control of the Foreign Trust and the Condominium, and the other evidence of KOZEL's assets discussed above, on or about April 5, 2016, KOZEL testified falsely that he was financially unable to satisfy the $34 million obligation to his Ex-Wife under the Payment Order.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of TODD KOZEL, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
SETH ROSE
SPECIAL AGENT
INTERNAL REVENUE SERVICE

Sworn to before me this
14th day of December, 2018

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK